UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

EQUAL EMPLOYMENT OPPORTUNITY      )
COMMISSION,                       )
                                  )
            Plaintiff,            )
                                  )
      v.                          )      No. 1:20-cv-00998-JRS-MJD
                                  )
HEART OF CARDON, LLC,             )
                                  )
            Defendant.            )

## ORDER ON MOTION FOR SUMMARY JUDGMENT

This case is about whether Heart of CarDon, LLC ("CarDon") violated the
Americans with Disabilities Act ("ADA") by failing to accommodate an injured
employee.  The Equal Employment Opportunity Commission ("EEOC") alleges that
CarDon should have moved Marsha Castellano to a front desk receptionist position
at another facility.  CarDon disagrees and moved for summary judgment.  (ECF No.
47.)  For the reasons below, CarDon's motion is **denied**.

## I. Background

CarDon operates assisted living facilities in Indiana.  (Castellano Dep., Ex. 10,
ECF No. 48-4 at4, 6.)  It provides long-term nursing care, memory care, and
rehabilitation services to seniors.  (Def.'s Br. 3, ECF No. 49.)  In July 2015, CarDon
hired Ms. Castellano as a Certified Nurse's Aide ("CNA") at Rawlins House, a CarDon
facility in Anderson, Indiana.  (Castellano Dep. 44, ECF No. 48-1 at 8; Def.'s Br. 3.)
On December 12, 2016, Ms. Castellano fell while working at Rawlins House and felt
a snap in her left arm.  (Castellano Dep. 47; Castellano Dep. Ex. 19, ECF No. 48-4 at

1

102.)  She began to feel immense pain in her left shoulder and arm, as well as some tingling and numbness in her left hand and forearm.  (Castellano Dep. Ex. 19, ECF No. 48-4 at 35–36.)  The pain was great enough that it limited the use of her left arm. (Castellano Dep. 47.)

Immediately after this injury, Ms. Castellano returned to work.  (*Id.* at 47–48.) Because of her pain, CarDon imposed several workplace restrictions.  (*Id.*)  CarDon imposed a weight limit of five pounds on her left arm and altered her workplace responsibilities.  (*Id.*)  Instead of assisting residents with daily activities, like bathing, grooming, dressing, feeding, and toileting, (*id.* at 44–45), Ms. Castellano began working solely on paperwork and filing.  (*Id.* at 48.)  Ms. Castellano took leave for rotator cuff surgery on March 2, 2017, and stayed on leave until May 15, 2017.  (*Id.* at 49–52; Castellano Dep. Exs. 27–28, ECF No. 48-4, at 6065.)

On May 15, 2017, Ms. Castellano returned to work at Rawlins House in a "modified duty position." (Castellano Dep. 107.).  In this position, she handled paperwork, organized the filing cabinet, and assisted Social Services workers and the Medical Records department.  (*Id.* at 69, 111.; Castellano Dep. Ex. 29, ECF No. 48-4, at 69.)  The modified duty position placed a restriction on Ms. Castellano: "no use of left arm." (Castellano Dep. Ex. 29, ECF No. 28-4, at 69.)  CarDon told Ms. Castellano to report to work Monday through Friday, although the Rawlins House supervisor Keary Dye gave Ms. Castellano permission to attend shifts when she could and to leave work freely.  (*Id.*; Castellano Dep. 107–09.)

2

Ms. Castellano still experienced pain in her left shoulder and swelling in her left hand, even though she was not using them. (Castellano Dep. 69–70.) Two days after starting this position, she told her physical therapist that she was sore, and four days after starting, her hand was purple and numb. (*Id.* at 111–12.) At times, her pain was much worse. (*Id.* at 113.) Sometimes the pain was so great that it affected her sleeping and kept her awake at night. (*Id.* at 114–15.)

On November 13, 2017, Ms. Castellano's physical therapist conducted a functional capacity exam to see if Ms. Castellano could perform the CNA job functions. (Castellano Dep. Ex. 20, ECF No. 50-8 at 1.) The results were mixed. On one hand, it was clear that Ms. Castellano could not perform the CNA role. (*Id.*) On the other hand, the functional capacity exam was optimistic. The therapist reported that Ms. Castellano could do some lifting, as she carried twenty pounds for twenty-five feet using her non-injured right arm. (*Id.*; Castellano Decl. ¶ 5(f), ECF No. 50-1 at 5–6.) The therapist wrote that she was "confident in projecting full time work tolerances" for Ms. Castellano. (Castellano Dep Ex. 20 at 2.) The therapist also found that Ms. Castellano was "functionally employable" and could be moved into a position at CarDon "respectful of the physical capabilities and tolerances outlined in this report." (*Id.* at 1).

On November 20, 2017, Ms. Castellano's doctor concluded that Ms. Castellano had reached maximum medical improvement for her injury. (Castellano Dep. 74.) Her doctor imposed permanent restrictions on her left side—no lifting over ten pounds with her left arm and no over-the-shoulder lifting with her left arm. (*Id.* at 74, 76.)

On or about November 22, 2017, CarDon told Ms. Castellano that she could no longer work as a CNA in a modified position, given her permanent restrictions. (*Id.* at 131–32, 150.) CarDon's human resources manager told Ms. Castellano to wait for corporate to contact her for further information.  (*Id.* at 132.) Sybil Rucker, a Compliance Benefits Specialist at CarDon, explained to Ms. Castellano that Ms. Castellano had thirty days to find an open and performable position within the company.  (*Id.* at 134–35; Def.'s Br. 10, ECF No. 49.)  If Ms. Castellano did not, she would be terminated.  (Castellano Dep. 134.)

Ms. Castellano did find a job that she wanted: a receptionist position at Harbour Manor, a CarDon-operated assisted living facility in Noblesville, Indiana.  (*Id.* at 140.)  The receptionist job description says that receptionists are responsible for, among other things, receiving, sorting, and forwarding the mail and deliveries sent to its facility.  (Castellano Dep. Ex. 3, ECF No. 48-4 at 1.)

Ms. Castellano informed Ms. Rucker of her interest, and Ms. Rucker said that she would see if Ms. Castellano could interview for the position.  Around two to three weeks into December, Ms. Rucker informed Ms. Castellano that Ms. Castellano could not apply for the position because there were lifting restrictions in the job description. (Castellano Dep. 142–43.) Ms. Castellano called Ms. Rucker several more times after this and even requested an accommodation.  (*Id.* at 144; Castellano Dep. Ex. 10, ECF No. 48-4 at 33.)  Ms. Castellano never heard back.  (Castellano Dep. 144, 149.)

Here, the EEOC brings a failure to accommodate claim under the ADA and seeks punitive damages under 1981a.  The EEOC says that CarDon failed to reasonably

accommodate Ms. Castellano by refusing to place her in the Harbour Manor receptionist position, a position she was qualified for with a reasonable accommodation.  (Pl.'s Statement of Claims 3, ECF No. 44.)  CarDon has moved for summary judgment on both liability and on punitive damages.  (ECF No. 47.)

## II. Legal Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the initial burden of production. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  That initial burden consists of either "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citing *Modrowski*, 712 F.3d at 1169).  If the movant discharges its initial burden, the burden shifts to the non-moving party, who must present evidence sufficient to establish a genuine issue of material fact on all essential elements of the case.  *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009).  "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (quotations omitted).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.

*Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018).  The Court cannot weigh evidence or make credibility determinations on summary judgment; those tasks are left to the factfinder.  *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

### III. Discussion

To prove a failure to accommodate claim under Section 12112 of the ADA, the EEOC must show (1) that Ms. Castellano is a qualified individual with a disability; (2) that CarDon was aware of Ms. Castellano's disability; and (3) that CarDon failed to reasonably accommodate the disability. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014) (citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)).  CarDon only contests one part of that first element: it disputes that Ms. Castellano is a qualified individual, not that she is disabled.

Qualified individuals are those who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  An employee's ability to perform the essential functions of the job is examined as of the time of the adverse employment decision at issue—here, December 2017. *Basden v. Pro. Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) (citing *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004)).

CarDon makes three arguments in its motion.  First, it argues that the EEOC violated Local Rule 56-1 for failing to contest CarDon's brief.  Second, CarDon argues that Ms. Castellano was not a qualified individual.  Specifically, it says that Ms. Castellano could not perform two essential functions of the receptionist position, with

6

or without a reasonable accommodation: (1) regular attendance, and (2) lifting more than ten pounds.   Third, CarDon moves for summary judgment on the issue of punitive damages.   The Court addresses these issues in turn.

A. Local Rule 56-1

At the outset, CarDon argues that the EEOC has failed to comply with Local Rule 56-1.   Local Rule 56-1 imposes a duty on the non-moving party to identify the facts in dispute.   The nonmovant must identify "the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment."   *Hinterberger v. City of Indianapolis*, No. 1:16-CV-01341-SEB-MJD, 2019 WL 1439159, at *2 (S.D. Ind. Mar. 30, 2019), *aff'd*, 966 F.3d 523 (7th Cir. 2020).

CarDon asserts that the EEOC has failed to specifically controvert the facts in CarDon's brief, aside from four conflicts identified on pages 1–3 of the EEOC's brief. CarDon says that pages 3–21 do not specifically controvert its statement of facts, and thus, summary judgment "is required."   (Def.'s Reply 4, ECF No. 52.)

Yes and no.   The Court agrees that the EEOC has offered additional facts on other topics and has not offered facts or evidence specifically controverting many of CarDon's assertions.   While the EEOC's brief does contain a Statement of Material Facts in Dispute, the EEOC has not offered conflicting evidence on several topics. Thus, as to those facts not specifically controverted by the EEOC, the Court treats CarDon's asserted and supported facts as uncontested.   *See Hinterberger*, 966 F.3d at 527.

But that does not mean CarDon automatically wins summary judgment. Even when a non-movant fails to respond, the movant must still show that summary judgment is proper. *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (citation omitted). In addition, the EEOC has offered its own facts to fight summary judgment. The Court assumes these facts are true to the extent admissible evidence supports them. S.D. Ind. L.R. 56-1(f)(2); S.D. Ind. L.R. 56-1(b), advisory committee comments (subsection (b) requires nonmovants to identify "material facts which preclude summary judgments *and/or* disputed material facts which do so."). To the extent that this new pool of facts allows the Court to draw reasonable inferences in the non-movant's favor, those inferences can be drawn and may defeat summary judgment. S.D. Ind. L.R. 56-1(f)(1)(C).

B. Qualified Individual

CarDon next maintains that Ms. Castellano was not a qualified individual, meaning she could not perform the essential functions of the receptionist position. Essential functions are "the fundamental job duties of the employment position." *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 569 (7th Cir. 2019) (citing 29 C.F.R. § 1630.2(n(1)). While courts generally do not "second-guess the employer's judgment" on essential functions, "[w]hether a function is essential is a question of fact, not law." *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020) (citations omitted). Thus, the Court asks if a reasonable jury could find that these job functions are "essential functions." *See Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 290–91 (7th Cir. 2015). Courts and jurors should consider the job's description, "the

8

consequences of not requiring the employee to perform the function, the amount of time an employee actually spends performing the function, and the experience of those who previously or currently hold the position." *Tonyan*, 966 F.3d at 688 (citing *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 197–98 (7th Cir. 2011)).

### 1. Regular Attendance

CarDon first notes that regular attendance is an essential function of the receptionist position, and the EEOC does not disagree. (Def.'s Br. 14.) Regular attendance can be an essential function of a job. *See, e.g.*, *Basden*, 714 F.3d at 1037. A receptionist at Harbour Manor testified that she was required to show up Monday through Friday and was evaluated based on her attendance. (Burns Dep. 25, 76 ECF No. 48-3 at 1, 14.) *See Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 490 (7th Cir. 2014) (finding attendance to be essential where it was part of an employee's evaluation). Moreover, attendance is necessary to perform many other tasks for which the receptionist is responsible. *See Bilinsky,* 928 F.3d at 569 (7th Cir. 2019). Thus, the Court finds no genuine dispute of material fact regarding whether regular attendance is an essential function of the receptionist position, given its job description, the CarDon employee manual, and the testimony of Harbour Manor receptionist Tonya Burns.[1]

---

[1] The EEOC argues that the Court should disregard the attendance argument entirely, because CarDon did not list this essential function in its position statement, answer, or interrogatories. (Pl.'s Br. 28.) The EEOC has cited no authority for this argument. The Court need not rule on this issue because there is a genuine issue of material fact regarding whether Ms. Castellano can attend work regularly.

But, the Court must consider whether there is a genuine dispute of material fact regarding whether Ms. Castellano could regularly attend work as a receptionist.[2] CarDon points out that, while working in a modified position, Ms. Castellano generally missed one day of work a week, sometimes more, from May 2017 to November 2017 due to her pain.  (Castellano Dep. 109–110.)  In total, Ms. Castellano was unable to complete a full work week for six months.  CarDon surmises that based on this history, as of December 2017, Ms. Castellano could not maintain regular attendance.

To survive summary judgment, the EEOC must produce evidence sufficient to permit a jury to conclude that Ms. Castellano could attend work regularly at the time of her termination.  *Basden*, 714 F.3d at 1037.  It has done so.  Ms. Castellano's physical therapist wrote in November of 2017 that she was "confident" that Ms. Castellano would return to "full time work tolerances" and that she could be put into a position immediately at CarDon.  The opinion that Ms. Castellano was "functionally employable" and should return to work in a "medium physical demand level" could lead a reasonable jury to find that Ms. Castellano could attend work full time after that exam.  Moreover, Ms. Castellano's own doctor also saw Ms. Castellano one week after this exam and did not say that Ms. Castellano could not attend work regularly. (*See* Castellano Dep. Ex. 21, ECF No. 48-4 at 48.)  Instead, her doctor released her to return to work with permanent restrictions.  (*Id.*)  Even after Ms. Castellano's

---

[2] The EEOC has not identified any accommodations for attendance.  Thus, the Court only looks to see if a reasonable jury could find that Ms. Castellano could regularly attend work without a reasonable accommodation.

termination, she continued looking for jobs and engaging in physical labor.  For example, when caring for her farm animals, while she could no longer use a wheelbarrow or carry a large bucket full of grain, she pulled a wagon instead of using a wheelbarrow, and relied on smaller buckets to carry water.  (Castellano Decl. ¶ 4.)  A reasonable jury could credit Ms. Castellano's physical labor and her efforts to find a job as evidence that she could regularly attend work in 2018.  From these points, there is enough here to create a genuine issue of material fact on whether Ms. Castellano could attend work regularly in December 2017.

CarDon argues that no reasonable jury could find that Ms. Castellano could regularly attend work after she missed one shift a week on average for the seven previous months.  Indeed, past absences may be probative of proving if one can regularly attend work in the future.  *See EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 959–60 (7th Cir. 2001) (an employee's absences in the past showed could not regularly attend work).  But as CarDon points out, the focal point of this analysis is at the time of Ms. Castellano's termination: December 2017.  Thus, the Court looks to evidence closest to that date.  *See Tonyan*, 966 F.3d at 690 (finding that evidence of performance two months before assigning permanent restrictions and two years after dismissal had little bearing on someone's capabilities at the time of dismissal).

In November 2017, one week before CarDon told her to stop working, Ms. Castellano's physical therapist opined that she was "confident" Ms. Castellano could tolerate full time work and could work in some position at CarDon, even one at the "[m]edium physical demand level."  (Castellano Dep. Ex. 20, ECF No. 50-8 at 1.)  A

reasonable trier of fact could look to her past absences, and then look to this report, and conclude: "well, that was then, and this is now."

CarDon counters that this capacity examination is not sufficient evidence under *Weigel v. Target Stores*, 122 F.3d 461 (7th Cir. 1997).  But the physical therapist's report provided here is distinguishable from the expert report proffered there.  In *Weigel*, the plaintiff proffered a psychologist's affidavit which stated that "to a reasonable degree of medical certainty . . . there was a good chance that [the plaintiff] could have returned to her position at Target as a cashier supervisor."  *Id.* at 468.  The Seventh Circuit found this affidavit insufficient to create a genuine issue of material fact.  The psychologist's affidavit was devoid of any "seeds of justification," and the court was left "totally in the dark" about that opinion's basis.  *Id.* at 469.  In essence, the psychologist did not explain the conclusion and thus, the court correctly discounted the "expert's naked conclusion about the ultimate issue."  *Id.* (citing *Am. Int'l Adjustment Co. v. Galvin*, 86 F.3d 1455, 1464 (7th Cir. 1996)).

Here, the EEOC provides more than just an "expert's naked conclusion."  The conclusion of the physical therapist is buttressed by the functional capacity evaluation, a test designed to determine if Ms. Castellano could return to work.  While the report's conclusion does not have the precision of a syllogism, the report does contain "seeds of justification" that a jury might credit.  Courts are not supposed to weigh evidence at summary judgment, thus so long as the Court is satisfied that this conclusion is worth considering, it should be part of the analysis.

12

CarDon argues that the physical therapist made this conclusion with the understanding that Ms. Castellano was being trained to work in Social Services. It points to two paragraphs in the report mentioning Social Services. Under "Main Limiting Factors," the therapist wrote that Ms. Castellano is being supported by CarDon to "train and perform task [sic] in Social Services. A job which the client reports requires no load movement during the job task beyond paperwork." (Castellano Dep. Ex. 20 at 1, ECF No. 50-8 at 1.) Under "Current Level of Function," the therapist noted that Ms. Castellano has been helping Social Services on light duty, and has been sent for certification in Social Services. (*Id.* at 2.) CarDon argues that given this context, inferring that Ms. Castellano could return to work would not be reasonable. (Pl.'s Reply 8.)

CarDon has a plausible argument, but the report contradicts the inference CarDon advances. Under "Physical Demand Level," the therapist writes that Ms. Castellano has the physical capabilities and tolerances to function at the Medium physical demand level." (Castellano Dep. Ex. 20 at 1.) The Medium Physical Demand level is defined on page ten of the report, and it says that the "Medium" band involves lifting more than 10 pounds "frequently" and between 34–66% of the day—this does not amount to "no lifting." (*Id.* at 10.)

CarDon also says that Ms. Castellano's pain continued in 2018 at the same level as before. In CarDon's view, no reasonable jury could find that Ms. Castellano could attend work regularly when her pain was the same as it had been in 2017 when she had attendance issues. But there is a question of fact regarding how much this 2018

13

pain affected Ms. Castellano.  Ms. Castellano's physical therapist was confident in full time work tolerances despite that level of pain.  In 2018, Ms. Castellano was still applying for work and caring for her farm animals.[3]  A jury may also credit her statement that she was capable of working in 2018, and may look past her 2017 attendance issues given her permission to miss work freely.  All this could lead a reasonable jury to find that she could have attended work regularly in the future.

CarDon also says that Ms. Castellano was unemployed throughout all of 2018, and suggests that her unemployment is evidence of her inability to work regularly. But not having a job is not the same as not regularly attending a job.  The inference CarDon wants (that Ms. Castellano did not work in 2018 because she was in too much pain) is not the only inference possible here, and in any event, the Court draws all reasonable inference in the EEOC's favor.

In sum, a reasonable juror could find that Ms. Castellano could return to work and work regularly.  Having found a genuine issue of material fact with regard to this essential function, the Court now turns to the other essential function: lifting.

2. *Lifting More than Ten Pounds*

CarDon says that lifting more than ten pounds is an essential function of the receptionist position.  The job description says that receptionists "may lift, transport, and stock office supplies," and that lifting 1–50 pounds is necessary to "successfully perform the essential functions of the position."  (Castellano Dep. Ex. 3 at 2, ECF No.

---

[3] Caring for farm animals may require different durations of work, varying and inconsistent amounts of lifting, or a less consistency than the Harbour Manor Receptionist position.  But that is a call for the factfinder to make upon weighing the evidence.

48-4 at 2.)   A receptionist from Harbour Manor, Tonya Burns, elaborated on how much lifting she does at Harbour Manor.   Ms. Burns said that lifting was required to accomplish three tasks: (1) sorting the USPS mail; (2) delivering packages and deliveries to residents; and (3) putting away the copy paper delivery.

First comes mail sorting.   Every day, USPS drops off mail for Harbour Manor and its neighboring facility, The Lodge, in one USPS tote.   (Burns Dep. 27–29, ECF No. 48-3 at 2.)   The tote is usually set on the floor.   (*Id.* at 28.)   The tote is usually half full, and full maybe once or twice a week.   (*Id.* at 31–32.)   Sometimes the tote weighs (what feels like) fifty pounds.   (*Id.* at 28–29.)   The receptionist's job is to sort out Harbour Manor's parcels from The Lodge's parcels.   (*Id.* at 27.)   Packages and mail addressed to The Lodge are taken out of the tote and placed in a separate tote.   (*Id.* at 27–28, 30–31.)   Ms. Burns testified that she has to lift those packages to remove them from the USPS tote.   (*Id.* at 33, 39.)   She estimates that 10% of the packages in the USPS tote weigh more than ten pounds, but that such packages only end up in the USPS tote twice a week.   (*Id.* at 32–35.)

Next comes delivering the packages.   Ms. Burns says that she has to deliver those packages from the USPS tote to residents, and in addition, deliver any packages or parcels brought by FedEx, UPS, Amazon, or family members.   (*Id.* at 30–31, 62–63.) These latter parcels are usually set on the ground next to the receptionist desk.   (*Id.* at 63–64.)   Unlike USPS packages, which are usually under 10 pounds, FedEx, UPS, and Amazon deliveries generally include one fifty-pound item per day.   (*Id.* at 69.)

Once these goods arrive, Ms. Burns takes those packages either from the USPS tote or from off the ground and delivers them to resident rooms.  (*Id.* at 68–69.)  She then places those parcels according to resident's instructions.  (*Id.* at 86.)  Ms. Burns said that these deliveries could be done with a cart.  (*Id.* at 69.)

Lastly, there is the paper delivery.  Staples brings Harbour Manor boxes of copy paper and stacks them near the receptionist's desk.  (*Id.* at 56–57.)  The stacks are tall, at least four or five boxes high.  (*Id.*)  Ms. Burns says these boxes are heavy, but that each ream of paper is around ten pounds.  (*Id.* at 54–55.)  Ms. Burns generally "scoops" these boxes with both of her arms or lifts them with the plastic straps on them until she can get her arms underneath them.  (*Id.* at 58–61.)  She then carries the boxes twenty steps to the copy room, where she stacks the boxes in stacks of three. (*Id.* at 54–55, 58–61.)  Ms. Burns said a dolly could be used, or a cart could be used to disassemble the boxes, cart the paper to the copy room, and then reassemble the boxes, but it would take time.  (*Id.* at 55–56.)

Ms. Burns estimates that in her week, she spends about one hour, collectively across all three of these tasks, lifting things heavier than ten pounds.  (*Id.* at 75.) Based on these facts, CarDon argues that lifting over ten pounds is an essential function of the Harbour Manor receptionist.

But the EEOC has shown facts creating a genuine dispute on this point.  While the job description says that lifting is required, the EEOC has shown that the job description does not necessarily reflect the Harbour Manor receptionist position.  For example, Ms. Burns testified that she does not lift objects nearly as often as the job

description claims.  (*See id.* 75–76.)  Additionally, it seems that some of the Harbour Manor receptionist's tasks can be performed without lifting.  For example, packages could be raised off the floor using a mechanical lift,[4] and then delivered with a wheeled cart.  Also, Staples could bring the paper deliveries directly to the copy room.  Once one accounts for the lifting eliminated by these tools, a reasonable jury could find the amount of time spent lifting may be less than what CarDon claims.  *See Tonyan*, 966 F.3d at 688 (the amount of time spent doing any activity is one factor in whether a function is essential).  Given these tools, there are few consequences if "lifting" is not done, since the end goal (delivering packages to residents; putting paper in the copy room) can still be reached.  *Id.* (if there are consequences to not doing the function, that leans in favor of it being essential).

There is one task illustrated by Ms. Burns that cannot be done without lifting: taking parcels out of the USPS tote and setting them on her desk or on a cart—a fact that weighs in favor of lifting being an essential function—thus, there is a genuine dispute about whether this single task in isolation would make lifting items more than ten pounds an essential function.  Since the determination of an essential function is a question of fact for the jury, and several of the factors are in dispute, there is a genuine dispute of material fact and summary judgment is improper.  *See Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016); Federal Civil Jury Instructions of

---

[4] Ms. Castellano says that she could move heavier items using a lift.  (Castellano Decl. ¶ 12, ECF No. 50-1 at 10).  The model she cites, (ECF No. 50-1 at 62), is available here: *Manual and Electric Office Lifts*, L.K. Goodwin Co. Material Handling Equipment, https://www.lkgoodwin.com/more_info/manual_and_electric_office_lifts/manual_and_electric_office_lifts.shtml (last visited Oct. 21, 2021).

the Seventh Circuit; Employment Discrimination: Americans with Disabilities Act, Jury Instruction 4.05 (2017 rev.).  Here, there exists a genuine dispute whether lifting items more than ten pounds, once modified by possible accommodations, is an essential function.

Moreover, there is a genuine dispute as to whether Ms. Castellano could perform the lifting requirements with an accommodation.  Ms. Castellano's therapist believed that, in November 2017, Ms. Castellano could lift more than 10 pounds "frequently" and between 34–66% of the day.  The functional capacity exam revealed that Ms. Castellano could lift up to twenty pounds with one arm.  Also, using various mechanical devices might allow her to lift and deliver heavier packages, including using lifting bands to remove heavier items from the USPS tote.  Based on this conflicting evidence, a reasonable jury could find that Ms. Castellano could perform the essential function of lifting with these accommodations.

Because a reasonable jury could find that Ms. Castellano could attend work regularly, that lifting over ten pounds is not an essential function of the Harbour Manor receptionist position, and that Ms. Castellano could perform that function with an accommodation, CarDon's motion for summary judgment on liability is denied.

C. Punitive Damages

Turning to the punitive damages argument, punitive damages are available under Section 1981a where an employer engages in a discriminatory practice "with malice or with reckless indifference to the federally protected rights of an aggrieved

18

individual." 42 U.S.C. § 1981a.  Under the Supreme Court's framework from *Kolstad v. American Dental Association*, the EEOC has the burden of showing (1) that CarDon acted with malice or reckless indifference to Ms. Castellano's federal rights; and (2) that there is a basis for imputing liability to the employer based on agency principles. *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 835 (7th Cir. 2013) (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 533–46 (1999)).  If the EEOC is imputing liability through an agent working in a "managerial capacity and . . . acting in the scope of employment," then the employer can avoid punitive damages by showing "that it engaged in good-faith efforts to implement an anti-discrimination policy." *Id.* (citing *Kolstad*, 527 U.S. at 544–46).  Cardon argues that they are entitled to summary judgment on the malice requirement and on the good-faith defense.

Regarding malice or reckless indifference: "A plaintiff may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the anti-discrimination laws but nonetheless ignored them . . . ." *AutoZone*, 707 F.3d at 835 (citing *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857–58 (7th Cir. 2001)) (quotations omitted).  Punitive damages hinge on the employer's state of mind or whether it acted "in the face of a perceived risk" that its actions violate federal law. *Morris v. BNSF Ry. Co.*, 969 F.3d 753, 767 (7th Cir. 2020) (citing *Kolstad*, 527 U.S. at 535–36).

Here, a reasonable jury could find that at least one CarDon decisionmaker was familiar with the ADA but nonetheless ignored it.  The EEOC has produced evidence that Kristina Harger attended training on the ADA.  (Harger Dep. 50–51, ECF No.

50-4 at 10.)   Ms. Harger testified that she is familiar with the ADA's reasonable accommodation requirement, its focus on essential functions, and its imposition of an ongoing duty to provide reasonable accommodations.  (*Id.* at 40–43, 46–47.)  In fact, Ms. Harger helped write CarDon's ADA policy.  (*Id.* at 172–74.)

There is also evidence that CarDon did not follow the ADA or CarDon's anti-discrimination policy.  Ms. Harger and Ms. Rucker decided that Ms. Castellano could not perform the essential functions.  (Rucker Dep. 79, ECF No. 50-7 at 14.)  Ms. Harger does not recall considering any potential accommodations for Ms. Castellano to perform the receptionist job.  (Harger Dep.  153.)  If found to be true, this may illustrate an instance that meets *AutoZone*'s malice definition: Ms. Harger had knowledge of the ADA requirements, and when evaluating Ms. Castellano's capabilities, she did not consider any reasonable accommodations, despite knowing what the ADA required.

There is also evidence that Ms. Harger and Ms. Rucker perceived a risk that failing to move Ms. Castellano to the requested receptionist position would violate the ADA.  After Ms. Rucker and Ms. Harger decided that Ms. Castellano allegedly could not meet the receptionist position's essential functions and told Ms. Castellano such, Ms. Castellano requested an accommodation.  (ECF 48-4 at 33.)  Ms. Castellano let them know that she had one good arm, and that she previously worked as a receptionist at a CarDon facility.  (*Id.*)  Ms. Rucker told the head of human resources this in an email, and Ms. Harger says that it would be reasonable to assume that she knew about this email.  (Harger Dep. 147.)  Given Ms. Harger's knowledge of the ADA

and her knowledge that CarDon had a duty to provide a reasonable accommodation, a reasonable jury could find that she acted in the face of a perceived risk of violating the ADA.

CarDon claims that punitive damages cannot lie here because there is no evidence that CarDon's decisionmakers thought that CarDon was violating the law. But, *AutoZone* held that 1981a's malice requirement can be established by proving a decisionmaker had knowledge of the ADA and ignored it. 707 F.3d at 835; *EEOC v. Dry Cleaning Servs. Corp.*, 24 F. Supp. 3d 782, 789 (S.D. Ind. 2014) ("The required mental state refers to the employer's awareness that its actions are in violation of federal law.") The EEOC has proffered facts that could lead a reasonable jury to find such here.

Yet, CarDon argues that this case is unlike *AutoZone*, because here, CarDon gave Ms. Castellano accommodations in the past. But Section 1981a can apply to a single discriminatory act. 42 U.S.C. § 1941a(b)(1) (punitive damages may be recovered where "the respondent engaged in *a discriminatory practice* or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."). Thus, to survive summary judgment the EEOC only needs to show that on this one occasion CarDon was reckless or malicious. That much it has done.

CarDon emphasizes that Ms. Rucker collaborated with Ms. Harger and touched base with the head of human resources to determine how to handle Ms. Castellano's case. However, in light of the evidence proffered by the EEOC, there is still a genuine

issue of material fact regarding whether CarDon was recklessly indifferent to Ms. Castellano's federal rights.  Thus, summary judgment would be inappropriate.

CarDon also argues that there is no genuine dispute of material fact that "it engaged in good-faith efforts to implement an anti-discrimination policy." *AutoZone, Inc.*, 707 F.3d at 835.  CarDon points out that it has an antidiscrimination policy, grievance procedures, and accommodation procedures.  (Castellano Dep. Ex. 45, ECF No. 48-4 at 112–15.)

But a reasonable jury could find that CarDon did not make a good-faith effort to implement these procedures, based on how much it deviated from its ADA policies. CarDon's policies set out that once a reasonable accommodation request is made, "the next step is for the parties to begin the interactive process to determine: the individual's limitations / restrictions, the job functions that are limited in or restricted from performing, and a possible accommodation to help the individual perform that function."  (Dep. Ex. 45, ECF No. 48-4 at 113.)  The EEOC has shown evidence indicating that none of those steps happened: no discussion to clarify Ms. Castellano's limitations; no explanation of what functions she was limited in performing (aside from a broad indication that she could not meet the lifting requirements); and no discussion on an accommodation.  On this record, a reasonable jury could find that CarDon did not engage in good-faith efforts to make good on its policies when it did not attempt to comply with some its own policies.

## IV. Conclusion

For the foregoing reasons, CarDon's Motion for Summary Judgment, (ECF No. 47), is **denied.**  The Magistrate Judge is requested to meet with the Parties to discuss resolution of this matter short of trial.

**SO ORDERED**.

Date:   10/29/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution by CM/ECF to registered counsel of record